IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DENNIS H.,[1]

        Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

Case No. 3:20-CV-460-NJR

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### BACKGROUND

Plaintiff applied for DIB in June 2015, alleging a disability onset date of September 29, 2008. On October 10, 2018, the ALJ held an evidentiary hearing. (Tr. 34). That day, Plaintiff amended the alleged onset date of disability to August 24, 2015. (Tr. 239). After holding an evidentiary hearing, an ALJ denied the application on March 5, 2019. (Tr. 15-28). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1.     The ALJ erred by improperly playing doctor translating raw medical evidence into RFC limitation.

2.     The ALJ erred by improperly evaluating opinion evidence.

3.     The ALJ erred by not basing her decision upon substantial evidence.

4.     The ALJ erred in her credibility determination.

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of

disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not worked at the level of substantial gainful activity

"during the period from his alleged onset date of August 24, 2015 through his date last insured of September 30, 2016." (Tr. 17). Plaintiff was insured for DIB through September 30, 2016. He was 51 years old on the date last insured. (Tr. 26). The ALJ found that Plaintiff had severe impairments of lumbar degenerative disc disease status-post fusion, benign prostate hypertrophy, and Wolf-Parkinson-White Syndrome. (Tr. 17).

The ALJ found that Plaintiff had the RFC to do light work, except Plaintiff was unable to climb ladders, ropes, scaffolds. (Tr. 19-20). The ALJ also found that Plaintiff had past relevant work. (Tr. 26). Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff was not disabled because he was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (Tr. 27).

EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

## I.    Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing on October 20, 2018. (Tr. 36).

Plaintiff was previously a carpenter foreman from 2003 to 2012. (Tr. 40-42). Plaintiff testified that he suffered a back injury on the job in 2008 when he fell from a crane. (Tr. 46). Plaintiff testified that since 2011, he has had problems standing or walking because of his back pain. (Tr. 55). Plaintiff explained that he wears a back brace every day.

(Tr. 56). Getting in and out of the shower, out of chairs, and straightening up is painful for Plaintiff. (*Id*.). Plaintiff also noted that since September 2016 he has had numbness and pain in his legs and hips. (Tr. 56-57). Plaintiff was able to drive to the hearing. (Tr. 61). To deal with these issues, Plaintiff does home exercises and home back stretches every morning and "some leg ones at night." (Tr. 62-63).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the RFC assessment—would there be light work for an individual with the same age, education, and work experience as Plaintiff. (Tr. 69). The VE testified that there are approximately 315,000 light unskilled hand packer positions nationally, approximately 196,000 light unskilled production worker positions nationally, and approximately 440,000 light unskilled cleaner positions nationally. (*Id*.). The ALJ also asked the vocational expert whether there are jobs in the national economy for someone reduced to a sedentary level. (Tr. 69-70). The VE testified there are approximately 22,000 sedentary unskilled hand packer positions nationally, 25,000 sedentary – unskilled production workers nationally, and 12,000 sedentary – unskilled inspector, test, sorter positions nationally. (Tr. 70).

## II.   Relevant Medical Records

On or around September 30, 2008, Plaintiff fell from a crane at work. (Tr. 308, 311). Two days later, on October 2, 2008, Plaintiff went to Hannibal Regional Hospital's emergency room. (Tr. 304). The emergency room physician, Joaquin Guzon, M.D. ("Dr. Guzon"), diagnosed him with a contusion and low back pain. (*Id*.). According to Dr. Guzon, the x-rays showed no evidence of broken bones. (Tr. 306). Plaintiff also had a

magnetic resonance imaging (MRI) on his lumbar spine. (Tr. 314). The MRI showed mild anterolithesis of L5 relation to S1, mild anterior wedging of L1 which is chronic, moderate sized protrusion of the disk posteriorly at the level of L4-L5, and broad based annular bulge of the disk at L5-S1 without significant stenosis. (*Id*.).

On November 4, 2008, Plaintiff saw David R. Lange, M.D. ("Dr. Lange"). Dr. Lange noted that "Mr. Herren was in no acute distress at all." (Tr. 325). Also, the "[s]traight leg raise exam in a seated position appeared to be normal." (*Id*.). According to Dr. Lange "Mr. Herren [was] not a candidate for invasive treatment at [that] time." (Tr. 326). Also, Dr. Lange could not offer an estimate of permanency could not be offered that day. (*Id*.).

In December 2008, Sherwyn Wayne, M.D. ("Dr. Wayne") evaluated Plaintiff's condition. (Tr. 424-427). During the orthopedic examination, Dr. Wayne noted that Plaintiff "moved about the room without any sign of acute distress." (Tr. 426). Dr. Wayne also noted that "[s]uperficial tenderness was present over the left paracervical, trapezius, and intrascapular areas to superficial palpation which appeared exaggerated and inappropriate in view of the minimal pressure." (*Id*.). Dr. Wayne continued noting that "lumbar examination revealed tenderness in the right paravertebral and midline area at L5-S1 with minimal pressure, which appeared exaggerated and inappropriate considering the degree of pressure." (*Id*.). Dr. Wayne noted that the degenerative changes at L4-5 and L5-S1 with a Grade I spondylolisthesis secondary to chronic pars defects "would have developed either congenitally or during adolescence and not as the result of this alleged injury." (Tr. 427). Dr. Wayne continued pointing out that "the probable diagnosis as it pertains to this accident is mechanical low back pain with

musculoligamentous basis considered a temporary condition without permanent aggravation of the pre-existent disease." (*Id*.). Based on the available information, Dr. Wayne agreed with Dr. Lange that "there is no indication for invasive treatment of any form and this would include epidural steroid injections and/or surgery." (*Id*.)

About a year later, in December 2009, Plaintiff visited Nicholas Poulos, M.D. ("Dr. Poulos"), a neurosurgical specialist. Dr. Poulos noted that Plaintiff had chronic mechanical lumbar spinal pain, a minor component of bilateral sciatic complaints, probable discogenic spinal pain at L4-L5 and L5-S1, segmental instability at L5-S1 from a probable pars defect, disc herniation at L4-L5, and severe bilateral foraminal stenosis. (Tr. 503). "Given the paucity of medical treatment, [Dr. Poulos] [decided] [ ] to start with conservative therapy." (Tr. 504).

In February 2010, Plaintiff was examined by Anthony Anderson, M.D. ("Dr. Anderson"). Plaintiff's chief complaint was his low back pain, which he rated "as a 5-6 on the visual analog scale." (Tr. 345). Dr. Anderson noted that Plaintiff was able ambulate and walk heel and tow without difficulty. (*Id*.). On February 5, 2010, Dr. Anderson injected a lumbar epidural steroid into Plaintiff. (Tr. 361). Then on March 19, 2010, Dr. Anderson performed an "[i]njection procedure for four-level lumbar discography at the L2-3, L3-4, L4-5, and L5-S1 levels." (Tr. 368).

In April 2010, Plaintiff was examined by Marc Huntoon, M.D. ("Dr. Huntoon") for a second opinion regarding back surgery. Dr. Huntoon had no issues with the back surgery, but advised that surgery "will not likely affect the pain in his lower extremities or his upper back." (Tr. 373). Instead, Dr. Huntoon noted that Plaintiff "need[ed] a chronic

pain rehabilitation program to work on both physical therapy, gradual re-introduction of normal activities, and return-to-work issues as well as some cognitive behavioral therapy to help him to overcome some fear avoidance beliefs." (*Id.*).

By June 2010, Plaintiff underwent a "total L4 and L5 laminectomy, left L4-L5 discectomy, bilateral L5-S1 Fill procedure and L4 to S1 nonsegmental bilateral pedicle screw fixation and posterolateral fusion." (Tr. 516). On October 25, 2010, an independent medical evaluation was performed. Based on this evaluation, Dr. Cantrell "believe[d] [Plaintiff] could work in at least a sedentary to light physical demand level where he is allowed to alternate sitting and standing every two hours, avoid repetitive bending and lifting less than 20 pounds occasionally." (Tr. 449).

By November 2010, Plaintiff could lift 20-25 pounds. (Tr. 467). Still, Plaintiff's range of motion in his lumbar spine was significantly limited. At his December 28, 2010 Functional Capacity Evaluation ("FCE"), Plaintiff could occasionally lift 40 pounds, and frequently lift 35 pounds. (Tr. 476).

At a January 2011 follow-up visit with his neurosurgeon, Dr. Poulos reviewed the FCE, and acknowledged that "[Plaintiff] was able to function within the medium to heavy work demand level per the U.S. Dictionary of Occupational Titles, as he was able to lift 40 pounds on an occasional basis and 35 pounds on a frequent basis." (Tr. 532). In February 2011, Dr. Poulos examined Plaintiff and noted that he was currently working in a light duty capacity. (Tr. 534). Plaintiff still had "mild to moderately tender over [the right sacroiliac joint]." (*Id.*). Dr. Poulos continued explaining that Plaintiff is effectively at maximum medical improvement. (*Id.*). On March 3, 2011, Dr. Poulos noted that "[c]urrent

lifting restrictions include max lifting of 35 pounds continuously." (Tr. 537).

Over four years later, on November 12, 2015, Plaintiff visited Raymond Leung, M.D. ("Dr. Leung") for a consultative examination. (Tr. 544). Plaintiff still had back pain that went down to his legs. (*Id.*). According to the examination, Plaintiff was able to walk one block and lift 11 pounds. (*Id.*). When asked to do things, Plaintiff had to be coached during the exam, and Plaintiff would repeatedly say "I can't." (Tr. 545).

By March 2016, Plaintiff visited Leoncio Dizon, M.D. ("Dr. Dizon"). Dr. Dizon noted Plaintiff's his low back pain. (Tr. 553). Plaintiff had no acute distress, and was diagnosed with a urinary tract infection (Tr. 554).

## III.    State Agency Consultants' Opinions

In December 2015, Kenneth Smith M.D. ("Dr. Smith") assessed Plaintiff's RFC based on a review of the record. Dr. Smith concluded that Plaintiff could do medium work. (Tr. 81).

In October 2016, a second state agency consultant, Frank Mikell, M.D. ("Dr. Mikell") reviewed the updated records. Dr. Mikell concluded that Plaintiff could do medium work (Tr. 92-93).

DISCUSSION

## I.    Translating Raw Medical Evidence Into RFC determination

Plaintiff first contends that the ALJ's "evaluation of the MRI results is flawed because the ALJ impermissibly 'played doctor.'" (Doc. 23, p. 3). Plaintiff argues that "[t]he ALJ based his assessment of her residual functional capacity 'after considering . . . the recent MRIs." (*Id.*). Plaintiff continues that "[w]ithout an expert opinion interpreting the

MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." (*Id.*).

Citing *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014), to argue that the ALJ "played doctor" is unpersuasive. In *Goins*, the ALJ "summarized the results of the 2010 MRI in barely intelligible medical mumbo jumbo, noting that it revealed degenerative disc disease and stenosis while ignoring the Chiari I malformation." *Id*. at 680. Here, the MRI of Plaintiff's lumbar spine was done in October 2008, and the ALJ relied on the findings of the emergency room physician. *See* Tr. 21. Later, in November 2008, the same MRI was analyzed by Dr. Lange, and Dr. Lange still found "[Plaintiff] could be working with perhaps a 30-pound lifting restriction with avoidance of awkward positions." (Tr. 325-326). This was also cited by the ALJ. *See* Tr. 21.

Plaintiff confusingly points to an independent medical exam from December 29, 2008. (Doc. 23, p. 4). But Dr. Wayne did not review the MRI at that time. In fact, the doctor noted "[a]s to whether the patient had a significant discogenic lesion at L4-5, I await review of the MRI scan but am impressed by both prior readers' interpretation of a left sided lesion involving asymptomatic neural structures." (Tr. 427). Dr. Wayne continued noting that "[w]ith regard to what, if any, work restrictions are required, and if MMI has been reached, I would again defer to review of the radiologic studies and a definitive comment at that time." (*Id.*). When Dr. Wayne reviewed Plaintiff's MRI scans, he noted that "[he] would limit [Plaintiff's] activities to occasional lifting of 50 pounds with frequent lifting of 35 pounds an no repetitive bending, twisting or climbing, and allowance to change position between standing, walking and sitting during the course of

a full workday." (Tr. 444).

Plaintiff then lists the findings of the February 3, 2010 examination, the June 9, 2010 lumbar laminectomy, discectomy and fusion at L4-S1, and the November 12, 2015 consultative examination. (Doc. 23, pp. 4-5). Plaintiff uses these visits to argue that "[t]he ALJ translated the clinical and objective findings into a light RFC but fails to explain how positive straight leg raise, positive facet loading test, decreased lumbar ROM, lumbar tenderness, spondylolisthesis, bilateral hamstring tightness, moderate right hip pain with Patrick's maneuver decreased strength, decreased sensation, slow and stiff gait, significantly limited lumbar ROM, antalgic gait and other exam findings throughout the record support the ability to stand and walk 6 hours in an 8 hour day." (*Id*. at p. 5).

These arguments are not alleging that the ALJ "played doctor," rather Plaintiff is asking the Court to reweigh the evidence. Indeed, Plaintiff argues that the ALJ was conclusory or without support in the record, but Plaintiff is incorrect. The ALJ explained that the opinion evidence from multiple physicians who conducted physical examinations of the Plaintiff in connection with his Workers' Compensation benefits claim in 2008-2011 "indicate that the claimant could perform a range of light to medium work with some postural restrictions, although the exact restrictions vary over time based on the claimant's responses to treatments and the specific findings on each examination." (Tr. 25). In doing so, the ALJ went into significant detail pointing to medical records that "show[] sufficient recovery with physical therapy and medications to return to, at least, light work." (Tr. 22).

The ALJ did not stop with Plaintiff's lifting restrictions, but continued noting that

the November 12, 2015 visit to Dr. Leung included "objective findings support[ing] the ability to perform light work with occasional postural maneuvers." (Tr. 23). Indeed, Dr. Leung noted that Plaintiff did not use a cane or a walker. (Tr. 544).

The ALJ did not play doctor, and Plaintiff's argument is merely an invitation for the Court to reweigh the evidence. The problem is the ALJ's conclusion was supported by the evidence, thus it must be upheld. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

## II. ALJ's Evaluation of Opinion Evidence

Plaintiff argues that "[a]lthough the ALJ discussed the weight to afford these physicians' opinions, he did not specify how or to what extent he considered these opinions when deciding the weight to assign them." (Doc. 23, p. 7). Plaintiff is incorrect. The ALJ identified how and to what extent she considered these opinions by noting the following:

> In considering these reports and weighing the opinions contained therein, the undersigned notes that the standards for determining disability in workers compensation cases are completely different from the standards used in Social Security cases. Additionally, the opinions regarding the claimant's status as disabled or not disabled go to an issue reserved to the Commissioner and these opinions are based on workers compensation standards. [ ] With this in mind, the undersigned fully reviewed and considered the various physicians' reports, including the findings, work restrictions, and the determinations of disabled or not disabled. The undersigned considered these opinions in the assessment of the claimant's residual functional capacity, as required by the Regulations. Although they do not receive great weight for the reasons discussed above, they receive significant weight because they are from examining and treating physicians who provided extensive, objective medical findings to support their opinions, and the findings are mostly consistent with those opinions.

(Tr. 25). The ALJ is required only to "minimally articulate" his or her reasons for accepting or rejecting evidence. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v.*

*Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Here, the ALJ met this "lax" standard because the reason she gave for the weight she assigned to the opinions were supported by the record and took into consideration the regulatory factors.

Plaintiff then criticizes the ALJ for affording significant weight to the opinions from physicians in connection with Plaintiff's claim for workers compensation benefits from 2008 to 2011. (Doc. 23, p. 8). Specifically, Plaintiff argues that "all of the opinions from the doctors and providers listed above predate the plaintiff's alleged onset date by several years." (*Id*. at p. 9). Plaintiff continues that "[t]hese opinions were not deserving of any weight and do not provide support for the ALJ's RFC." (*Id*.).

Not only does Plaintiff fail to cite any authority for the above argument, but this argument gains no traction with the Court, as Plaintiff previously pointed to a December 29, 2008 examination, a February 3, 2010 examination, an October 25, 2010 evaluation, and the June 9, 2010 lumbar laminectomy in support of remand. If physician opinions from 2008 through 2011 are undeserving of any weight, then surely the December 29, 2008 examination, February 3, 2010 examination, October 25, 2010 evaluation, and the June 9, 2010 lumbar laminectomy would also be undeserving of any weight.

Plaintiff also contends that the ALJ improperly gave "some" weight to the state agency physicians' opinions. (Doc. 23, p. 10). Plaintiff continues pointing out that the "state agency physicians relied upon and adopted the 2010 FCE findings in concluding plaintiff could perform medium work." (*Id*.). This would be an issue if the ALJ simply relied on 2010 FCE findings, but the ALJ relied on the November 12, 2015 consultative examination, a visit with Dr. Hugo Villarreal on February 17, 2016, and a visit with Dr.

Dizon, on March 3, 2016. Accordingly, this argument is denied.

### III.    Basis for RFC Determination

Next, Plaintiff argues that the "RFC is not based upon substantial evidence." (Doc. 23, p. 11). Plaintiff then continues noting what the ALJ must do when denying benefits. Plaintiff does not point to what the ALJ failed to do, ignored, or otherwise did to commit an error. Without more, this argument fails.

### IV.    ALJ's Credibility Determination

According to Plaintiff, the ALJ failed to explain whether the daily activities were *consistent* or *inconsistent* with the pain and limitations Plaintiff claimed. (Doc. 23, p. 13). This assertion is directly contradicted by the ALJ's decision. Indeed, the ALJ explained:

> the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely *consistent* with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 21) (emphasis added).

Plaintiff continues arguing that the "ALJ in this matter simply found that Plaintiff's testimony was not credible without explaining why." (Doc. 23, p. 13). Again, this argument is directly contradicted by the ALJ's decision which listed why Plaintiff's testimony was inconsistent with the medical evidence and other evidence. Without a recitation of the ALJ's specific reasoning, the ALJ detailed how the exams, medical imaging, and other diagnostic techniques generally showed only mild or moderate abnormalities. (Tr. 21).

This is not a situation where the ALJ failed to build the required "logical bridge"

from the evidence to his conclusions as to Plaintiff's RFC. Rather, the ALJ considered the medical evidence that at times showed significant findings and "assessed corresponding limitations in the claimant's residual functional capacity (RFC), which includes several substantial restrictions." (*Id.*). The ALJ's decision must be affirmed.

CONCLUSION

After careful review of the record as a whole, the Court finds that ALJ committed no errors of law, and her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:**   September 20, 2021

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**